Robert Calvin BOYETTE,
Petitioner–Appellant,

v.

Eugene S. LEFEVRE, Superintendent,
Franklin Correctional Facility,
Respondent–Appellee.

No. 99–2674.

United States Court of Appeals,
Second Circuit.

Argued: June 9, 2000.

Decided: April 03, 2001.

---

.Robert J. Boyle, New York, NY, for Petitioner–Appellant.

Howard A. Getzler, Assistant District Attorney, Kings County, Brooklyn, N.Y. (Charles J. Hynes, District Attorney, Kings County, and Leonard Joblove, Assistant District Attorney, on the brief).

Before CALABRESI and POOLER, Circuit Judges, and CEDARBAUM, District Judge.*

POOLER, Circuit Judge:

Petitioner Robert Calvin Boyette ("Calvin Boyette, Boyette, or Calvin")[1] appeals from a judgment of the United States District Court for the Eastern District of New York (Gleeson, *J.*) that denied his application for a writ of habeas corpus. Boyette contends that the Kings County District Attorney's office withheld exculpatory materials from him in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). When Boyette first raised this claim in the course of a post-conviction proceeding, the Supreme Court of the State of New York for Kings County (Moskowitz, *J.*) found that the prosecutor withheld material exculpatory documents and vacated Boyette's conviction. However, the New York State Appellate Division, Second Department, reversed because its "review of the hearing record" convinced it that "the defendant failed to demonstrate that he had, in fact, been denied certain materials to which he was entitled;" certain of the items allegedly withheld were not *Brady* material; and even if the materials were not delivered and were *Brady* material, no prejudice resulted to defendant. *People v. Boyette,* 201 A.D.2d 490, 491, 607 N.Y.S.2d 402 (2d Dep't 1994)

Because the state appellate court did not identify which materials were not withheld and which were not *Brady* material, we confront the difficult question of the application of the deferential review standards imposed by the Anti Terrorism and Effective Death Penalty Act ("AEDPA") to unclear findings. We conclude that full

AEDPA deference is due only to factual findings and mixed findings of fact and conclusions of law that we can fairly infer from the state court opinion.

## BACKGROUND

This appeal involves an unusually brutal crime. In the early hours of February 21, 1982, two young men robbed and brutalized 47–year old Regina Ehrlich and then set her apartment on fire, leaving her to die. Ehrlich identified Boyette, a neighbor, as one of her attackers. Through two trials, two state post-conviction procedures, and two appeals, Boyette maintained a defense of mistaken identity and alibi. In the face of this defense, the first jury could not reach a verdict. However, the alibi apparently failed to convince a second jury, which convicted Boyette on all counts. Some of the documents the prosecutor allegedly withheld cast doubt on the certainty of Ehrlich's identification. Therefore, we focus first on Ehrlich's descriptions of her attackers and on Boyette's alibi evidence. To address the question of whether the prosecutor failed to turn over *Brady* material in context, we also set out the history of Boyette's two trials as well as the subsequent post-conviction proceedings and appeals.

### I. Ehrlich's Descriptions of Her Attackers

On February 21, 1982, Fire Marshal Bollman interviewed Ehrlich at six and eleven a.m. In his report concerning the first interview, Bollman states that Ehrlich said two men attacked her and that "she believes the tall slim boy was Calvin who lives in the building just in front of hers to the right and lives on the third floor."

---

* The Honorable Miriam Goldman Cedarbaum, United States District Court Judge for the Southern District of New York, sitting by designation.

1. Most of the witnesses at trial referred to Boyette as Calvin. For comprehensibility, we adopt that usage.

Ehrlich also "said she would recognize them if. she can see but her eyes are burned." After the eleven a.m. interview, Bollman reported that Ehrlich said that one subject "may be Calvin Boyett[e]." Ehrlich also said she would like to see a photograph of Boyette to be certain of her identification. Finally, she said that both subjects wore masks.

On April 5, 1982, New York City Housing Detective John Ruiz interviewed Ehrlich and attempted to show her a photo array including Boyette's picture. According to Ruiz, Ehrlich told her that one of her attackers was over six feet tall and the other was about five feet five. The taller man "was a male black in his late teens, sloppy, with missing teeth." Because Ehrlich could not see well enough to make an identification, Ruiz did not show her the photos. Ehrlich did not identify either of her attackers by name. Ruiz, who arrested Boyette, testified that Boyette had no missing teeth but that he had "an underbite, where his bottom teeth and jaw protrude out more than his top teeth." At a *Wade*[2] hearing before Boyette's first trial, Ehrlich admitted that she initially told police that it looked like her attacker's front teeth were missing.

On October 25, 1992, Ehrlich selected Boyette's photo from a photo array and identified him as one of her attackers.

At Boyette's second trial, Ehrlich gave the following testimony concerning her identification of Boyette. Boyette lived in the next building, she knew him, and she saw him a few times a week in passing over a several year period. On February 21, 1982, she arrived home at around 12:36 a.m. As soon as she got out of the elevator in her building, two young men pushed

her through the door of her apartment. Once inside the apartment, Ehrlich fell on the floor. The perpetrators then kicked her and dragged her by her hair to the back bedroom. There, they continued to kick and hit her and handcuffed her. Once the handcuffs were on, "Calvin" took off his ski mask and started to rub the handcuffs in an apparent attempt to remove his fingerprints. Ehrlich said, "I won't recognize you. Don't hit me anymore." Ehrlich continued to be able to see Boyette for "a few minutes"[3] while he and the other assailant, who did not wear a mask, battered her. The two men then tied Ehrlich's feet with a telephone cord, rubbed some kind of fluid that smelled like paint or lighter fluid on her mouth, and drew a wire around her neck. Ehrlich passed out, and when she woke up, both she and the apartment were burning. On cross-examination, Ehrlich denied having said that the man she identified as Calvin Boyette had missing teeth. She claimed instead that she told Ruiz "that it looked like [Boyette's] teeth were missing because his jaw was protruding, one over the other." Ehrlich also claimed that "right away after the accident," she told Ruiz and another detective that "it was Calvin Boyett[e], and I feel sorry for his mother."

A defense witness, Kathryn Cosenza, testified that she had a chance encounter with Ehrlich in the summer of 1982 or 1983. Although Cosenza had not known Ehrlich previously, she began talking to Cosenza about having been burned. Ehrlich said that there were three attackers and although she had not seen their faces, she had heard one of the men call another Calvin. When Cosenza asked, "How could you do something like this, you know, if you just hear a name? It could be a

---

**2.** *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

**3.** On cross-examination, Ehrlich said that she saw Boyette's face for "[a] good 20 minutes, 15, 20 minutes."

hundred Calvins," Ehrlich responded, "I made a statement . . . and I can't change it." Cosenza admitted that she knew Boyette's mother, and Ehrlich denied ever having had a conversation with Cosenza or with anyone else during which she admitted she did not see her assailant's face.

## II. Alibi Evidence

The defense called six witnesses in an effort to substantiate Boyette's claim that he was in Virginia at the time of the crime. Sheila Boyette ("Sheila"), defendant's sister, testified that on January 25, 1982, she took a bus with him to Norfolk, Virginia. According to Sheila, she remained in Virginia for about two weeks, and Calvin stayed after she left.

Barbara Ruiz ("Barbara"), Calvin's aunt, testified that her nephew stayed with her from January 25, 1982, until the early winter of 1983, when he left for Dodge City, Kansas where he was to attend college. Barbara also testified that Calvin's girlfriend, Melissa Smith, gave birth to his baby while Calvin was in Virginia. On February 20, 1982, Barbara saw Calvin from around 11:30 in the morning until 6 o'clock at night when he went out with his cousins David and Denise Ruiz. Calvin, David, and Denise returned to the house about nine in the evening and then left again. Calvin came back just before midnight, and Barbara saw him again the following day.

Denise Ruiz ("Denise") testified that Calvin lived with her, her mother, her brother David, and her sister Jody during February 1982. She identified Melissa Smith as Calvin's girlfriend and testified that on February 14, 1982, Calvin, she, and Melissa went to a dinner party at Lawrence Leo Hawkins' residence. She identified a picture of Calvin and Melissa taken at the dinner party and testified that later that night, Melissa had a child. Finally,

Denise said that she saw Calvin on February 20, 1982, when Hawkins, who was her boyfriend, took her, Jody, David, and Calvin to Bradlee's, a clothing store, to buy baby clothing. She believed that they arrived around seven in the evening.

David Ruiz ("David") testified that he, Calvin, Denise, Jody, and Hawkins purchased clothes for Calvin's newborn son at Bradlee's on February 20, 1982, then returned to his mother's house, and finally went to Newport News to drop off the clothing. He claimed that he saw Boyette the next day as well.

Melissa Smith testified that Calvin Boyette was the father of her son and identified the picture that showed her and Calvin in Hawkins' house on February 14, 1982. She claimed that after the dinner at Hawkins' house, Calvin took her to his Aunt Ellen Walker's house and then to the hospital for the birth of their baby. Smith said she saw Calvin virtually every day the next week including February 21, 1982, when Calvin and his cousins brought over clothing for the baby.

Ellen Ross Walker, defendant's aunt, testified that she began seeing Calvin at her sister Barbara Ruiz' house around the end of January 1982. When Walker worked, which she did six days a week, she brought her mother to stay at Ruiz' house, and Calvin sometimes cared for the elderly woman. Walker testified that she saw Boyette every day that she went to Ruiz' house until he left for college in Kansas in January or February of 1983. She also saw him occasionally at the store where she worked because he sometimes came to borrow money from her. One of these occasions was "around the 20th" of February.

Assistant District Attorney Kevin Murphy was able to point out that the prior testimony of Barbara and David Ruiz dif-

fered in some significant details from that given in a prior proceeding. He also impeached Melissa Smith by suggesting that she initially told Virginia State Troopers that she had never seen Calvin Boyette in Virginia.

Calvin Boyette testified that on January 25, 1982, after several short visits to Virginia, he began a longer stay that lasted until he left for college in January 1983. His remaining testimony also was generally consistent with that of the alibi witnesses.

## III. Prior State Court Proceedings

### A. The trials and sentencing.

Petitioner's first trial in early 1984 ended in a hung jury. Terry Selzer, his attorney for that trial, testified at petitioner's second § 440.10 hearing that the jurors told him they were deadlocked nine to three for acquittal.

At the second trial, Attorney John Corbett represented Boyette. He did not attempt to impeach Ehrlich by asking her about her earlier statements to Fire Marshal Bollman. The jury convicted Boyette of attempted murder in the second degree, arson in the second degree, two counts of robbery in the first degree, two counts of burglary in the first degree, assault in the first degree, and reckless endangerment.

On November 20, 1984, the trial court (Sybill Hart Kooper, *Justice*) sentenced Boyette to twelve and one-half to twenty-five years' imprisonment. Before imposing sentence, Justice Kooper said, "I listened to the complainant. She said she was absolutely sure. She said so after the crime. She knew who it was." Attorney Joel Dranove, who appeared for Boyette, made the following comment:

Judge, in the last week, I had an investigator go out to just try to find some witnesses or whatever. I found, in po-

lice reports, the name and address of an alleged perpetrator of the crime for which my client stands convicted and a further report from the police with respect to that person that they didn't bother. They just weren't going to pursue it.

### B. Post–Trial State Court Proceedings

In May 1986, Dranove filed a motion pursuant to New York Criminal Procedure Law § 440.10 to vacate Boyette's conviction. Boyette claimed that the prosecution had withheld exculpatory evidence in the form of police report DD5 No. 26 in which Detective Ruiz reported he had received a call from a confidential informant who stated that Bobby Mason was a potential suspect in the case (the "Bobby Mason report"). He also alleged that Corbett rendered ineffective assistance to Boyette because, among other reasons, he did not prepare the alibi witnesses who testified and failed to call available alibi witnesses who were not related to Boyette. In support of the *Brady* claim, Dranove submitted a letter from Corbett in which he said he could not recall whether he had the Bobby Mason report at the trial but that he had turned over all the reports he did have to Sheila Boyette; an affidavit from Sheila Boyette concerning her receipt and examination of Corbett's records; and affidavits from petitioner and two other witnesses stating that Bobby Mason had missing front teeth. Sheila Boyette swore that (1) after the first trial, Corbett gave her his file which included various reports as well as a log of reports numbered one through thirty-three; (2) when she checked the log against the reports, she noticed that numbers twenty-six and thirty-three were missing; (3) she asked Corbett for these reports, but he said he had given her everything he had and directed her to Murphy; and (4) on the date her

brother was sentenced, Murphy gave her the Bobby Mason report but not report number thirty-three. Murphy swore he had turned over all police reports including the Bobby Mason report to Selzer and that he also gave a copy of the Bobby Mason report to either Corbett or Sheila Boyette at some time during the second trial.

New York State Supreme Court Justice Thaddeus Owens denied Boyette's motion on September 3, 1996. At oral argument, Justice Owens stated that "I am not going to declare a lawyer being incompetent," indicated doubt that the defense could have gotten the Bobby Mason report into evidence, and stated that he was not going to hold a hearing to determine whether the Bobby Mason report had been withheld. He gave no other reason for denying the motion.

The New York State Appellate Division, Second Department considered Boyette's direct appeal and his appeal from denial of the Section 440.10 motion together. See People v. Boyette, 149 A.D.2d 716, 540 N.Y.S.2d 702 (2d Dep't 1989). It affirmed the conviction because the evidence was legally sufficient and the verdict was not against the weight of the evidence. See id. As to the Section 440.10 motion, the Appellate Division stated, "the record discloses no improvident exercise of discretion on the part of the Supreme Court in denying [Boyette's] request for a hearing [and] the court properly denied the motion on the merits." Id. (citation omitted)

In 1988, Dranove wrote to the district attorney's office to ask that hair samples that were taken from the hat Boyette allegedly wore during the attack on Ehrlich, which was found near Ehrlich's apartment and introduced at trial, be maintained indefinitely because of newly available DNA fingerprinting technology. The district attorney's office could not locate either the hat or the hairs.

In September 1990, Dranove made a second Section 440.10 motion based on newly discovered evidence. He submitted an affidavit from Dwayne W. Johnson, who claimed that at a time generally consistent with the crime, he saw Bobby Mason and Johnny Beale running away from the street where Regina Ehrlich lived. Mason allegedly later admitted to Johnson that Mason and Beale committed a "push-in" in which they beat a woman.

Dranove submitted a supplemental affirmation in which he suggested that the district attorney may deliberately have destroyed the hairs, thus committing a *Brady* violation.

Over objections from the district attorney, Justice Ruth Moskowitz ordered a hearing. During Detective Ruiz' testimony, Boyette's counsel asked to see the detective's file. Dranove then informed the court that although the DD5s in Ruiz' file were numbered one through forty, prior trial counsel gave him only one through twenty-five and twenty-seven through thirty-two.[4] He claimed that he "hadn't the slightest idea that there [were] 34 through 39," and that neither he nor prior counsel were aware of the fire marshal reports contained in Ruiz' file. Dranove also gave the court a copy of the list of exhibits that he received from Corbett, which stopped at number thirty-three. Later, Sean Courtney, the assistant district attorney handling the hearing, offered to go through his file page by page with Dranove.

 On January 18, 1991, Courtney notified Justice Moskowitz that he had discovered a transfer box containing many files relevant to the Boyette case. At this

---

4. Number twenty-six was the previously referenced Bobby Mason report.

juncture, Justice Moskowitz broadened the scope of the hearing "to include an inquiry" as to whether the prosecution had violated obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881, *cert. denied* 368 U.S. 866, 82 S.Ct. 117, 7 L.Ed.2d 64.[5]

Because only the *Brady* issues are before us, we summarize the evidence at that hearing only insofar as it is relevant to those issues.[6] As the hearing proceeded, the following documents occupied center stage:

1. Twenty-six fire marshal interview sheets describing interviews with the victim (including the interview on February 21, 1982, in which she indicated she would like to see a picture of Calvin Boyette to be sure that he was her assailant) and other witnesses ("fire marshal interview sheets"). The log that Ruiz produced at the hearing refers to a list of these interviews as DD5 number thirty-four.

2. Handwritten notes by police and fire personnel including an interview sheet stating that Calvin Roland had been interviewed and said that he didn't do it and was at a party (the "Calvin Roland note") and a note in Detective Ruiz' handwriting saying "no accelerant used on victim" (the "accelerant note"). Ruiz' log contains no apparent reference to these notes.

3. A typewritten interview sheet drafted by Fire Marshal Mauro on May 17, 1982, reporting on an interview with Murphy in which he stated that Ehr-

lich's description of her attacker did not fit Boyette and that she had not been able to identify Boyette from photos (the "Murphy/Mauro interview sheet"). It is not clear whether the Murphy/Mauro interview sheet is referenced in Ruiz' log.

4. Murphy's telephone message pad, which contained—on the reverse of one message—the notation "Rule out Boyette" (the "Rule out Boyette message"). This message is not included in the log.

5. The Bobby Mason report, which is DD5 number twenty-six.

Dranove unequivocally denied that any of these materials were in the files turned over to him by John Corbett, who died in 1987. After conducting a document by document review of the materials in the prosecution's file, Selzer, Boyette's first attorney, candidly admitted that he could not tell for sure whether he had many of the documents at the time of the first trial. However, he said he was "absolutely positive" that he had never seen the Mauro/Murphy interview sheet and the Rule out Boyette note. He "believe[d]" that the first time he saw the Bobby Mason report was when Dranove sent him a copy and testified that if it had been in his file, he would have used it to cross-examine Ruiz. Selzer first saw the fire marshal interview sheets and the Calvin Roland note a week before his testimony when Courtney showed them to him.

Murphy, who prosecuted Boyette at both the first and second trials, testified that he "recall[ed] turning over documents," and "[t]o the best of [his] knowl-

---

**5.** *Rosario* recognized a state law duty on the part of the prosecutor to give defense counsel all pretrial statements of prosecution witnesses. *See id.* at 289, 213 N.Y.S.2d 448, 173 N.E.2d 881.

**6.** The other evidence included testimony by three additional eyewitnesses—Lawrence Leo Hawkins, Lowell Perry, the mayor of Kill Devil Hills, North Carolina, and Audrey D. Boyd, a store clerk—who corroborated portions of Boyette's alibi.

edge, ... [he] turned over all fire department and any other law enforcement records [he] ha[d] in [his] possession." He did not, however, make any record in his file as to which documents he had turned over. Murphy did not recall ever having seen the Murphy/Mauro report. He believed that he had turned over reports thirty-four through forty because "there is nothing in them, other than information about the arrest and how there was nothing in it." When the court asked Murphy how he could be sure that he turned over everything without a log, Murphy said:

It's my recollection that when—well, your Honor, I can only answer that with respect to my general practice which, at the time, was that when reports were duplicated for being provided to defense counsel, that a separate duplicate set was made to indicate which documents were turned over to maintain in the office file.

But on my review of the office file this morning, the file is not in the same condition [i]n which I left it back in 1984.

Justice Moskowitz found that the prosecution committed both *Brady* and *Rosario* violations. The court identified several factors supporting its finding that Murphy did not turn over the Bobby Mason report, fire accelerant note, Calvin Roland note, fire marshal interview sheets, and the Rule out Boyette note in addition to many other documents. First, Murphy did not keep a log of documents that had been disclosed. Second, the court's independent review of pre-trial appearances did not show any in-court disclosure of the documents. Third, after "[h]aving personally listened to [Murphy's] testimony and observed his demeanor, [she] believe[d] that Mr. Murphy was less than candid with the court" because Murphy denied any independent recollection of the Murphy/Mauro report, which

the court viewed as clearly exculpatory, and he was unable to explain why he had written "Rule out Boyette." Fourth, although Corbett was unavailable for questioning, it was logical to assume that Selzer turned over his entire file to Corbett and that Corbett, in turn, gave all of his records to Dranove. Finally, the court independently reviewed the records of the *Wade* hearing and the two trials and found it incredible that experienced counsel would conduct such cursory cross-examination, especially of Detective Ruiz, if they had the documents in question.

Justice Moskowitz then found that the Murphy Mauro interview sheet and Bobby Mason report were *Brady* material and that the "Rule out Boyette" note was not. She further held that if these documents "had been available to the defense at the ... trial, there is a reasonable possibility that the outcome of the trial may have been different." The court also found that the Bobby Mason report, the fire marshal interview sheet from the February 21, 1982, 6:00 a.m. interview with Ehrlich, the accelerant note, and the Calvin Roland note were *Rosario* material and that the *Rosario* violations also justified vacatur of the conviction. Finally, Justice Moskowitz found in favor of Boyette on his original claim, the newly discovered Dwayne Johnson evidence.

On September 17, 1992, the Appellate Division, Second Department remitted the People's appeal to Justice Moskowitz for a determination of whether the *Rosario* violations resulted in prejudice to Boyette. Justice Moskowitz held that "[t]he four items which this court found to have been undisclosed *Rosario* material, were, both individually and cumulatively, important to this case which centered around an identification made by a sole eyewitness. The effect of nondisclosure of this material was

to deprive defense counsel of an opportunity to test the victim's credibility."

The Appellate Division, Second Department, reversed. After rejecting petitioner's newly discovered evidence claim, the court turned briefly to the *Brady* and *Rosario* claims. The appellate court's entire analysis of these claims follows:

[U]pon our review of the hearing record, we find that the defendant failed to demonstrate that he had, in fact, been denied certain materials to which he was entitled. Furthermore, certain of the items which the defendant claimed, and the Supreme Court agreed, were *Rosario* and/or *Brady* material, were not properly found to be such material. Finally, even if those items were never delivered to him and were properly classified as *Rosario* or *Brady* material, no prejudice could have resulted to the defendant.

*People v. Boyette*, 201 A.D.2d 490, 491, 607 N.Y.S.2d 402 (2d Dep't 1994) (internal citations omitted).

## IV. District Court Proceedings

In April 1997, Boyette filed the petition now before this court in the United States District Court for the Eastern District of New York. He asserted both ineffective assistance of counsel and *Brady* claims. In an October 12, 1999, decision, the district court (Gleeson, *J.*) denied Boyette's petition but granted a certificate of appealability on the *Brady* claim. *See Boyette v. Lefevre*, 1999 WL 890425 (E.D.N.Y. Oct.12, 1999).

The district court began its analysis of the *Brady* claim with the suppression issue. *See id.* at *9. The judge determined that he need not decide whether 28 U.S.C.A. § 2254(d) as it existed prior to the enactment of AEDPA or the post-AEDPA standard governed its review of the state court's factual finding on this issue because both standards accorded "a presumption of correctness for state court factual findings and [included] a requirement that a habeas petition be dismissed if those findings are reasonably supported by the record." *Id.*

Next, the district court found that although the Appellate Division said Boyette did not prove "certain materials" had been withheld, "it evidently meant its statement to cover all of [the evidence]." *Id.* at *10. The court determined that the Appellate Division's finding was not reasonably supported as to the Murphy/Mauro report because Murphy testified at the hearing that he had never seen this report. *See id.* On the other hand, Judge Gleeson found "ample support for the ... conclusion" that the prosecutor turned over the Bobby Mason report based on defense counsel's reference during sentencing to a document that might have been the Bobby Mason report. *Id.* The district court found sufficient support in Murphy's testimony concerning the ordinary practices of his office for a finding that the State did not withhold the remainder of the evidence. *See id.* Unlike the hearing court, the district court did not believe that Murphy's failure to remember the Murphy–Mauro report or the meaning of the "Rule out Boyette" note six years after trial reflected adversely on his credibility. *See id.*

The district court also found that Boyette's failure to receive the Murphy–Mauro report could not have prejudiced him because Murphy's admission that Ehrlich could not identify Boyette's photo prior to May 1982 was consistent with her own testimony that she could not see the photos initially, and his statement that Ehrlich's description did not match Boyette's appearance merely repeated Ruiz' testimony. *See id.* at *11.

Notwithstanding the district court's conclusions on suppression, it went on to

consider the possible combined prejudicial effect of withholding all the documents except the Bobby Mason report. It found that Boyette would not have been prejudiced because

> The disputed pieces of evidence must be considered against the backdrop of Ehrlich's strong and unequivocal identification of Boyette at trial. If admissible at all, the disputed evidence would have been of marginal and largely tangential impeachment value. It seems highly unlikely that such impeachment evidence would have shaken Ehrlich's firm identification, and its unavailability to defense counsel at trial does not undermine confidence in the results of his trial.

*Id.* at *12.

This appeal followed. Because of the limited certificate of appealability, only the *Brady* issues are before us on appeal.

## DISCUSSION

### I. Standard of Review

■ We review the district court's denial of the writ of habeas corpus *de novo.* *See Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997). However, in conducting our review, we also must defer to state court findings of fact, mixed findings of fact and law, and conclusions of law. *See* 28 U.S.C. § 2254(d), (e).

The Supreme Court recently resolved an issue that was undecided when Judge Gleeson ruled. AEDPA's standards for reviewing state court findings and conclusions apply to any petition filed, as Boyette's was, after AEDPA's effective date. *See Williams v. Taylor,* 529 U.S. 362, 402,

120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, *J*, writing for the majority as to Point II). Pursuant to AEDPA, a federal court cannot grant a writ of habeas corpus to a state prisoner on a claim

> that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Moreover, in any such proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

■ Initially, we do not agree with the district court's conclusion that the Appellate Division found that Boyette failed to establish all the contested documents were withheld. It distorts the clear meaning of the court's finding that Boyette failed to prove "certain materials" were withheld to assume the court meant he failed to prove *any* of the materials were withheld. Because the Appellate Division did not specify which documents Boyette failed to show were suppressed, we have no discernable finding of fact to which we can defer.[7] *See*

---

7. If the Appellate Division had made specific findings concerning the materials withheld, we would confront a difficult issue because the Appellate Division's holding reversed the hearing court's credibility findings. Pre–AEDPA precedent. establishes that deference is due to a state appellate court's fact finding. *See Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Ventura v. Meachum,* 957 F.2d 1048, 1055 (2d Cir.1992). However, in both *Sumner* and *Ventura,* the appellate court made a finding of fact on an

*Ventura v. Meachum,* 957 F.2d 1048, 1055 (2d Cir.1992)("Without such a finding there could be no deference or presumption of correctness . . . ."); *cf. Washington v. Schriver,* 240 F.3d 101, 107–10 (2d Cir. 2001) (no AEDPA deference due without an adjudication on the merits of the petitioner's constitutional claim).

■ Nor can we accord AEDPA deference to the hearing court's findings of fact. Because the Appellate Division rejected the hearing court's determination as to one or more of the disputed documents, it would be inappropriate to defer fully to the hearing court's factual findings. *Cf. Micheaux v. Collins,* 944 F.2d 231 (5th Cir. 1991) *(per curiam, en banc)*(declining to accord presumption of correctness to trial court's "proposed findings" of fact, where court of appeals did not incorporate them and peremptorily denied relief in a manner inconsistent with the findings). In this very unusual situation involving an appellate court's rejection of certain of the hearing court's factual findings without specifying which of those findings were rejected we believe that we must review the record before the hearing court and give weight to its credibility findings only to the extent that they are supported by the record.

■ The appellate court also did not identify which materials were not *Brady* materials, and the hearing court made rulings on only three of the contested documents. Because it is not clear which of the hearing court's findings the appellate court rejected and because no state court determined whether some documents were

*Brady* materials, we must exercise *de novo* review of this issue. *See Washington,* 240 F.3d at 110 (holding that when constitutional claims are not adjudicated on the merits, we must review mixed questions of fact and law *de novo*).

However, the appellate court did find that even if all the documents were withheld and all were *Brady* material, no prejudice ensued to Boyette. We must affirm this conclusion and hence the district court's denial of the petition unless it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## II. Did a *Brady* Violation Occur?

### A. Definition

■ "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

### B. Suppression of Evidence

■ The record amply supports the hearing court's determination that the prosecution withheld the fire marshal interview sheets from February 21, 1982, the Calvin Roland note, the Rule out Boyette

issue not explicitly addressed by the trial court. *See Sumner,* 449 U.S. at 541–42, 101 S.Ct. 764 (appellate court reviewed for first time defendant's claim that photographic identification was impermissibly suggestive); *Ventura,* 957 F.2d at 1055 (deference due to appellate court's historical fact finding that trial court implicitly made a certain finding). We need not determine here the standard that

AEDPA mandates for review of an appellate court's determination that the hearing court's finding lacks sufficient support. *Cf. Jones v. Jones,* 938 F.2d 838, 842–43 (8th Cir.1991) (denying pre-AEDPA presumption of correctness with respect to factual findings not clearly made by trial court and to appellate court's legal conclusion as to the sufficiency of these findings).

note, and the accelerant note. Like the district court, we do not view Murphy's inability to recall the Murphy/Mauro interview sheet or to remember the significance of the Rule out Boyette note as suspicious. However, except with respect to the Bobby Mason report, much more evidence supports a conclusion that the prosecutor did not turn over the remaining materials than that he did. First, two of the three defense attorneys testified unequivocally that they had not seen the other materials. Second, Murphy's recollection of what he turned over was vague and generally relied on his usual practice. Third, the log of DD5s given to defense counsel ended at thirty-three and did not include the fire marshal reports. Fourth, the only record Murphy kept of materials that he gave to defense counsel was a duplicate set of copies, and he testified that the file he reviewed for the hearing had changed since the trial. Fifth, and most important, it is simply inconceivable that competent defense counsel would not have used the accelerant note, the Calvin Roland note, and the fire marshal interview sheets to impeach Detective Ruiz and Ehrlich. Based on all these factors and even without giving additional deference to the trial court's opportunity to hear and see the witnesses, we would reach the same conclusion as the hearing court as to all of the documents except the Bobby Mason report. With respect to that report, two additional facts tilt the proof toward the prosecution's position. First, Dranove seemingly admitted that a document similar to the report had been in his possession for at least a week prior to sentencing. Moreover, the Bobby Mason report was listed in the original log of DD5s. Based on these two factors, we believe that the district court reasonably concluded that defense counsel received the Bobby Mason report before or during trial.

## C. Favorable to the Accused

■ The second prong of a *Brady* analysis requires a showing that the material not disclosed was favorable to the accused. *See, e.g., United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence is favorable to the accused if it either tends to show the accused is not guilty or impeaches a prosecution witness. *See id.* at 676, 105 S.Ct. 3375. Evidence favorable to the accused generally is referred to as *Brady* material. *See Strickler*, 527 U.S. at 281, 119 S.Ct. 1936.

The Appellate Division found that not all of the documents the hearing court identified as *Brady* material were correctly labeled but did not identify which, if either, of the two pertinent documents—the Murphy/Mauro interview sheet and the Bobby Mason report—did not meet the *Bagley* standard. Neither the hearing nor the appellate court discussed whether the fire marshal interview sheets, Calvin Roland note, or accelerant note were *Brady* material. Finally, the hearing court found that the "Rule out Boyette" note was not *Brady* material.

■ As noted earlier, where AEDPA applies, we reject a state court's legal conclusion as it applies to the facts of a particular case only if it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from its precedent." *Williams*, 529 U.S. at 406, 120 S.Ct. 1495. In deciding whether the state court unrea-

sonably applied Federal law to a given set of facts, we must use an objective test of unreasonableness. *See id.* at 409, 120 S.Ct. 1495. The hearing court's conclusion that the "Rule out Boyette" note was not *Brady* material is neither contrary to established Supreme Court precedent nor an unreasonable application of that precedent. The prosecutor's jotting does not tend to show that Boyette was not guilty or to impeach any witness who testified against him.

We do not owe AEDPA deference to either the hearing or appellate court's conclusions on the Murphy/Mauro report because it is impossible to discern the Appellate Division's conclusion on this issue. We conclude that this report is not *Brady* material because it contains the inadmissible hearsay impression of the district attorney who prosecuted the case that Ehrlich's description of her attacker did not match Boyette's appearance. There is no indication in the record of the Section 440 hearing that Murphy based this conclusion on anything other than Ruiz' statement that Ehrlich described her attacker as missing his front teeth. Thus, even if admissible, the report has no independent exculpatory value and is not *Brady* material.

We now consider the three documents that neither of the state courts labeled as *Brady* material or non-*Brady* material. Ehrlich's initial statements to Fire Marshal Bollman that Calvin may have been one of her attackers and that she would like to see a photograph of him to be sure tend to impeach her later statements that she was certain from the time of the attack that Calvin Boyette was one of the perpetrators. Thus, it is classic *Brady* material. The same is true of the accelerant note because it tends to show that Ehrlich was confused when she said that her attacker smeared an oily sub-

stance on her face. The Calvin Roland note also suggests that Ehrlich did not clearly identify her attacker initially.

We thus hold that the fire marshal interview sheets, the accelerant note, and the Calvin Roland material were *Brady* material because they could have helped the defense suggest an alternative perpetrator or impeach Ehrlich and Ruiz.

### D. Materiality/Prejudice

Finding that these documents are *Brady* materials does not end our inquiry. The suppression of exculpatory documents does not cause a constitutional violation unless the documents are material, i.e., "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375.

The state appellate court held that even if the materials discussed by the hearing court were *Brady* or *Rosario* material and had been withheld from Boyette, he was not prejudiced. *See People v. Boyette,* 201 A.D.2d at 491, 607 N.Y.S.2d 402. Because the Appellate Division adjudicated this claim on the merits, we review its conclusion pursuant to AEDPA. There is no indication in the Appellate Division's decision that it applied a standard that was "contrary" to Supreme Court holdings. 28 U.S.C. § 2254(d)(1). Therefore, we can set aside its conclusion only if it constitutes an unreasonable application of Supreme Court holdings to the facts of this case. *See id.*

Several well-established propositions guide a materiality analysis. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley,* 514

U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Instead, the court must determine whether, in the absence of the undisclosed evidence, the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Second, the "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35, 115 S.Ct. 1555. Third, "once a reviewing court ... has found constitutional error, there is no need for further harmless-error review." *Id.* at 435, 115 S.Ct. 1555. Fourth, the reviewing court must consider the suppressed evidence "collectively, not item by item." *Id.* at 436, 115 S.Ct. 1555.

■ Applying the *Kyles* principles, we find that the Appellate Division's conclusion that Boyette was not prejudiced constitutes an objectively unreasonable application of Supreme Court precedent to the facts of this case.

We start with the fact that the only evidence against Boyette was Ehrlich's testimony. No physical evidence tied him to the scene, and no other witness claimed that Boyette was anywhere but in Virginia at the time of the crime. Ehrlich's testimony was particularly persuasive because she knew Boyette by sight and claimed that she recognized him at the scene. She also testified that she told detectives right away that Boyette was one of the perpetrators. In the face of Ehrlich's strong testimony, the first jury nevertheless deadlocked with nine to three favoring acquittal. It is thus apparent that this jury had difficulty reconciling the testimony of the several witnesses who testified that Boyette was in Virginia at the time of the crime with Ehrlich's seemingly consistent conviction that Boyette was her attacker. *Cf. Kyles,* 514 U.S. at 429, 115 S.Ct. 1555 (noting jury deadlock in first trial as relevant fact).

Second, Boyette's alibi witnesses were quite convincing. Although the prosecutor impeached Smith and Barbara and David Ruiz, he did not significantly undermine the consistent thread of all five witnesses' testimony—that Calvin Boyette was in Virginia at the time of the crime. Moreover, there was a sound basis for each witness' recollection of the events in question because they followed shortly after the birth of Calvin Boyette's son.

The Calvin Roland report has only minimal impeachment value. Although the defense could have used these reports to undermine the credibility of Ruiz' investigation to some extent, the credibility of the investigation was not the central issue in this case. However, the Appellate Division unreasonably applied existing Supreme Court precedent when it found that the remaining documents were not material. Only by crediting Ehrlich's testimony and rejecting that of the alibi witnesses could a reasonable jury find Boyette guilty beyond a reasonable doubt. Thus, her credibility and her ability to recognize her attackers were central issues in this trial. The fire marshal's notes concerning the February 21, 1982, interviews would have been extremely useful impeachment evidence for defense counsel because they suggest Ehrlich could not positively identify Boyette immediately. Use of the notes to cast doubt on Ehrlich's account would have supported the defense theory that Ehrlich did not clearly perceive her attacker. With the notes, defense counsel could have argued more plausibly that Ehrlich did not see her attacker well enough to identify him and thought only that he bore a resemblance to "Calvin." Defense counsel then could have made a potentially convincing argument to the jury that Ehrlich's suspicion hardened into certainty

during the months between the attack and her first positive identification of Boyette in October 1982 and that the physical and psychological torment she suffered during that period contributed to her need to identify an attacker. The accelerant note also casts doubt on Ehrlich's ability to clearly perceive or remember events as they happened during her attack.[8] These two documents in combination with the long delay in arresting Boyette suggest that Ehrlich did not make a positive identification of her attacker until long after the attack. Coupled with the complete absence of other evidence linking Boyette to the crime and the substantial proof that he was in a different state, the note and interview sheet could well have persuaded the jury to acquit. Because this very close case depended solely on Ehrlich's credibility, the Appellate Division applied *Kyles* in an objectively unreasonable way when it concluded—without any analysis—that Boyette was not prejudiced. Not only is it reasonably probable that the cumulative impact of the accelerant note and the fire marshal's report would have resulted in a different outcome, *see id.* at 441, 115 S.Ct. 1555, but in the context of this essentially one-witness case, their non-disclosure seriously undermines "confidence in the outcome of the trial." *Id.* at 1566. We therefore reverse.

## CONCLUSION

For the reasons we have discussed, we reverse the judgment of the district court and remand to the district court to grant

the petition unless the state grants Boyette a new trial within ninety days.

---

8. We disagree with the State's argument that this evidence is merely cumulative of other impeachment evidence. The other evidence—principally Ruiz' testimony concerning Ehrlich's description of her attacker—centered on Ehrlich's initial statement that her attacker was missing front teeth. The jury apparently accepted the proffered explanation for this discrepancy, i.e. that Calvin Boyette had an underbite. The evidence in question here, on the other hand, concerns the reliability of Ehrlich's memory and her ability to see her attackers.