**Anthony DiSIMONE, Petitioner–Appellee–Cross–Appellant,**

**v.**

**William E. PHILLIPS, Eliot L. Spitzer, Respondents–Appellants–Cross–Appellees.**

**Docket No. 05–6893–pr.**

United States Court of Appeals, Second Circuit.

Argued: June 21, 2006.

Decided: Aug. 22, 2006.

John R. Bartels, Jr., Bartels & Feureisen, LLP, White Plains, N.Y., for the Petitioner–Appellee–Cross–Appellant.

Valerie A. Livingston, Assistant District Attorney for Janet DiFiore, District Attorney of Westchester County (Richard Longworth Hecht, on the brief), White Plains, N.Y., for the Respondents–Appellants–Cross–Appellees.

Before MINER and CALABRESI, Circuit Judges, and RESTANI, Chief Judge, United States Court of International Trade.*

CALABRESI, Circuit Judge.

This case arises out of a 1994 fight that ultimately claimed the life of Louis Balancio, a twenty-one-year-old college student who had gone bar-hopping with his friends. Anthony DiSimone, the Petitioner–Appellee–Cross–Appellant ("DiSimone" or "Petitioner"), was identified as a suspect in Balancio's murder and went into hiding for more than five years before finally surrendering to police on November 9, 1999. On October 25, 2000, after a three-week jury trial in New York Supreme Court, Westchester County (Cowhey, J.), a jury found DiSimone guilty of

---

* The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

depraved indifference murder under New York Penal Law § 125.25(2) and of separate counts of tampering with physical evidence. Although prosecutors presented evidence that DiSimone had stabbed Balancio thirteen times with a knife at close range, the jury acquitted DiSimone of intentional murder.

On April 23, 2004, after the Appellate Division, Second Department affirmed his conviction and leave to the New York Court of Appeals was denied,[1] DiSimone timely filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York (Brieant, J.). In his petition he asserted three grounds for habeas, all of which he had raised in his direct appeal in state court:

[P]etitioner was denied his constitutional rights and a fair trial (i) by the prosecutions [sic] suppression of Brady material that another individual had stabbed the victim; (ii) that the admission of * * * out-of-court conversations violated the Confrontation Clause; [and] (iii) that New York Penal Law § 125.25(2) (murder with depraved indifference) is unconstitutionally vague * * *.

On October 19, 2004, nearly six months after DiSimone had filed his federal habeas petition and more than seventeen months after his conviction had become final, the New York Court of Appeals decided *People v. Payne*, 3 N.Y.3d 266, 819 N.E.2d 634, 786 N.Y.S.2d 116 (N.Y.2004), in which the court announced that depraved indifference murder could not properly be charged in most "one-on-one"

shootings or knifings. The *Payne* court explained:

[I]f a defendant fatally shoots the intended victim once, it could be murder, manslaughter in the first or second degree or criminal negligence (or self-defense), *but not depraved indifferent murder*. Moreover, it should be obvious that the more the defendant shoots (or stabs or bludgeons) the victim, the more clearly intentional is the homicide. Firing more rounds or inflicting more wounds does not make the act more depravedly *indifferent*, but more intentional. Absent the type of circumstances in, for example, *Sanchez*[2] (where others were endangered), a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder.

*Payne*, 3 N.Y.3d at 272, 786 N.Y.S.2d 116, 819 N.E.2d 634 (second emphasis in original).

In a Reply Memorandum to the district court on January 4, 2005, DiSimone, recognizing the possible relevance and usefulness of the *Payne* decision, argued for the first time that the evidence in his case was insufficient to support a conviction for depraved indifference murder. 25 Citing the United States Supreme Court's decisions in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), petitioner argued that he "was convicted of recklessness under factual circumstances which New York's highest court has held can only show intent." The prosecution objected that while

---

1. *People v. DiSimone*, 298 A.D.2d 399, 751 N.Y.S.2d 403 (App.Div.2d Dep't.2002) (Second Department, affirming conviction); *People v. DiSimone*, 99 N.Y.2d 613, 787 N.E.2d 1170, 757 N.Y.S.2d 824 (N.Y.2003) (New York Court of Appeals, denying leave to appeal).

2. In *People v. Sanchez*, 98 N.Y.2d 373, 777 N.E.2d 204, 748 N.Y.S.2d 312 (N.Y.2002), a divided New York Court of Appeals (4–3) upheld a conviction for depraved indifference murder against a sufficiency of the evidence challenge, where the defendant had shot the victim from a range of not more than 12 to 18 inches.

DiSimone had raised a void-for-vagueness challenge in the state courts, he had failed to challenge the sufficiency of the evidence there.

The New York Court of Appeals's *Payne* decision raised an important question of state law that might be dispositive of the federal question raised in DiSimone's habeas petition:[3] Does *Payne*'s holding apply retroactively to convictions that had become final prior to the court's ruling?[4] The district court, reasoning that "[o]ur federalism requires deference [to the state courts] * * * and that the Courts of New York have a full and effective opportunity to address these points," stayed the case for thirty days to allow DiSimone to argue in the state courts that *Payne* should apply retroactively to his case. In accordance with the stay, DiSimone filed a petition raising his insufficiency claim in New York County Court, County of Westchester (Zambelli, J.) ("Westchester County Court")—only to have that court conclude that his insufficiency claim was procedurally barred because "[s]ufficiency of the trial evidence can be reviewed only by direct appeal." The Westchester County Court also concluded that DiSimone had failed to preserve the issue of legal insufficiency on direct appeal, and that his failure to do so was not justified on the ground that it

would have been "futile" for him to raise the claim at the time.[5] The Appellate Division denied, without opinion, DiSimone's motion for leave to appeal.

In spite of the Westchester County Court's ruling, the district court proceeded to grant habeas relief on November 30, 2005, after concluding: (a) that DiSimone's insufficiency claim had in fact been adequately raised in the state courts, and (b) that, on the merits, the evidence was insufficient to convict DiSimone of depraved indifference murder. *DiSimone v. Phillips*, 04 Civ. 3128 (S.D.N.Y.2005). The writ, which did not extend to DiSimone's conviction for tampering with physical evidence, was stayed pending appeal.

We reverse the district court's grant of habeas and hold that raising a void-for-vagueness challenge in state court does not, without more, suffice to preserve the "substance" of an insufficiency claim for purposes of federal habeas. As a result, DiSimone's insufficiency claim was procedurally barred, and given that DiSimone failed to show cause and prejudice or actual innocence, habeas relief was not available to him on that claim. 28 U.S.C. § 2254(b)(1). *See Jackson v. Edwards*, 404 F.3d 612, 618 (2d Cir.2005) ("To be eligible for habeas relief, the 'substance' of [petitioner's] * * * claim * * * must have

---

**3.** We use the word "might" because we need not, and hence do not, take any position on whether, on the facts of the case before us— involving a large fight with various participants and a possible misperception of the victim's identity, see *infra*—the petitioner's actions could, even under New York law, after *Payne*, support a finding of depraved indifference murder.

**4.** In *Policano v. Herbert*, 430 F.3d 82, 92 (2d Cir.2005), *rehearing en banc den'd by* 453 F.3d 79 (2006), a panel of this court determined that, as a matter of state law, *Payne*'s interpretation of New York Penal Law § 125.25(2) should be viewed as applicable retroactively to convictions that became final before *Payne*

was handed down. That panel has, since, withheld its mandate and certified the question to the New York Court of Appeals, 453 F.3d 75 (2d Cir.2006), and the New York Court of Appeals has agreed to consider it, 7 N.Y.3d 779, —— N.Y.S.2d ——, —— N.E.2d —— (2006).

**5.** The Westchester County Court reasoned that the *Payne* decision did not constitute a "change in the law," as contemplated by N.Y. CRIM. PROC. LAW § 440.10(2)(a) (Consol.2006), which permits a defendant to argue that his failure to pursue appellate review of a ground or issue was justified where there has been such a change.

been 'fairly presented' to the appropriate state appellate court." (quoting *Picard v. Connor*, 404 U.S. 270, 275, 278, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971))).

We conclude, however, that—*unless* DiSimone or his defense counsel " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence,' " *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993))—the government prejudicially violated its *Brady* obligations by failing to disclose information about another stabber until near the end of the prosecution's case. Accordingly, and in light of the district court's summary dismissal of DiSimone's *Brady* claim, we remand the case to that court for further fact-finding as to the extent of DiSimone's or his defense counsel's knowledge of that *Brady* information.

Finally, for reasons explained below, we refrain from ruling on DiSimone's Confrontation Clause claim.[6]

## BACKGROUND

### I. The Fight

Sometime in the early morning of February 4, 1994, Louis Balancio and a few friends, who had been bar-hopping in New Rochelle and Yonkers, New York, made their way to the "Strike Zone" in Yonkers. For reasons the record does not specify, the bouncer at that bar refused to let them in. At about the same time, a group of Albanians also were denied admission, and in short order a fight broke out in front of the entrance to the bar. Although it is not clear what sparked the fight,[7] the evidence at trial indicated that the victim Balancio participated in it. The trial evidence further indicated that Balancio died of stab wounds received during the melee.

The autopsy report described Balancio's wounds in detail. It established that Balancio was stabbed thirteen times—four times in the front of his body, six times in the back, and three times on the upper left arm. One stabbing pierced the upper lobe of the Balancio's left lung and another pierced his heart. The medical examiner concluded that each of the thirteen wounds contributed to his death, and that death would have followed within fifteen minutes from massive blood loss. Balancio died of his wounds at approximately 2:15 a.m., not long after the fight began.

### II. The Trial

Shortly after DiSimone surrendered to police, after being in hiding from police for more than five years, he was indicted and a jury trial was held in October of 2000. The prosecution's trial evidence consisted primarily of the testimony of eyewitnesses, none of whom actually saw DiSimone stab Balancio. The prosecution's principal witness was Darin Mazzarella, who entered into a cooperation agreement with the FBI in the summer of 1997 in exchange for leniency over an unrelated case involving a murder and cover-up in which he was implicated.

Mazzarella testified to the following facts. He and another individual named Eric Tofty were, at the time of Balancio's death, friends of DiSimone, and were both present at the Strike Zone during the night of February 3 and morning of February 4, 1994. Moments after the fight broke out, people began to flee from the area. Mazzarella, who was heading in the

---

**6.** DiSimone does not appeal the district court's dismissal of his remaining claims.

**7.** At trial, DiSimone's counsel argued that Balancio and his friends referred to themselves, and were known by others, as the "Hell's Kitchen Gang," and had been having problems with a group of Albanians who lived in the area.

direction of the bar, saw Balancio's body lying on the ground near the entrance, and then saw an Albanian running, knife in hand, in the direction away from Balancio's body. Having observed the Albanian, Mazzarella then saw DiSimone, who also was running and carrying a knife, and who began to chase one of Balancio's friends into a parking lot. DiSimone eventually gave up the chase, and joined Mazzarella and Tofty in his car, which was parked nearby. In the car, Mazzarella noticed that DiSimone's right hand was bleeding. At some point, DiSimone pulled a gun from under his seat and aimed it at people running toward a bar down the street, but Mazzarella and Tofty were able to calm DiSimone down before any shots were fired.

The three men drove back to Mazzarella's apartment. While still in the vehicle, DiSimone confided that he thought he had stabbed an Albanian. Mazzarella told DiSimone in response that he thought one of the "younger kids" had been stabbed. Then, as the car approached an overpass, DiSimone threw the knife out of the window. Later that morning, DiSimone, Mazzarella, and others convened at Mazzarella's apartment. DiSimone, who had been wearing a sweater and leather jacket, and Tofty, who was wearing a teal sweatsuit, removed their blood-stained clothes and left them in the care of a man named Alfred Santorelli, who had just arrived at Mazzarella's apartment.

An FBI Special Agent, David Calore, also testified at trial. He presented the following facts. Later in the morning of February 4, Santorelli took DiSimone's and Tofty's clothing, which had been put in garbage bags, and threw them into trash receptacles at a White Castle restaurant in the Bronx. Fortuitously, Calore happened to be in his car in the restaurant parking lot, waiting to have lunch with a former FBI partner, when he observed Santorelli dispose of the bags. Once Santorelli left, Calore collected the clothing and sent it to the FBI laboratory in Washington, D.C. for fingerprint and DNA analyses.

FBI DNA scientists also testified at trial. According to their testimony, DNA testing showed that blood on the leather jacket and sweater matched DiSimone's and that some of the blood on the cuff of the sweater matched Balancio's. A forensic blood splatter expert further testified that the stain on the cuff was "consistent with" the person wearing the sweater having stabbed Balancio. On these facts, the jury found DiSimone guilty of depraved indifference murder and of tampering with physical evidence.

*III. Post-trial*

DiSimone was sentenced, on January 26, 2001 to indeterminate concurrent terms of imprisonment of twenty-five years to life for the murder charge and one and one-third to four years for the tampering charge. The state courts affirmed his conviction, but the United States District Court for the Southern District of New York granted DiSimone's petition for the writ of habeas corpus on his claim of insufficiency of evidence. It is this grant of habeas relief that the government appeals. DiSimone, in turn, appeals the district court's summary rejection of the *Brady* and Confrontation Clause claims he also had asserted.

**DISCUSSION**

On appeal, the government makes two challenges to the district court's grant of habeas relief. First, it argues that the district court exceeded its authority under 28 U.S.C. § 2254 when it granted a writ of habeas corpus upon a procedurally barred claim. Second, it contends that, on the merits, the district court was wrong in its determination that the evidence adduced

at trial was insufficient to support DiSimone's conviction for depraved indifference murder. In reply, DiSimone asserts that the district court properly granted habeas relief and further argues that the district court should not have rejected his *Brady* and Confrontation Clause claims.

In all, these arguments present us with as many as four issues: (1) whether DiSimone had exhausted his insufficiency claim and whether that claim is procedurally barred by the subsequent ruling of the Westchester County Court; (2) if DiSimone's insufficiency claim is properly presented, whether on the merits the evidence was constitutionally insufficient to convict him of depraved indifference murder; (3) whether the government violated its disclosure obligations under *Brady*; and (4) whether the admission of tape recorded statements violated that Confrontation Clause.[8] We now turn to these issues.

## I. Procedural Default

### A. The effect of the Westchester County Court decision.

The procedural posture of this case appears somewhat awkward. The district court stayed DiSimone's habeas petition in order to allow the state courts to address his insufficiency claim, which suggests that the district court believed petitioner's insufficiency claim was unexhausted. *See Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005) (holding that a district court has discretion in certain circumstances to stay a mixed habeas petition containing exhausted and unexhausted claims to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition). But when the state courts responded that DiSimone's insufficiency claim was procedurally barred and that DiSimone had failed to preserve the claim on direct appeal, the district court rejected this holding as "unreasonable" and concluded for itself that DiSimone's insufficiency claim had been exhausted, i.e., had been raised and rejected in state courts, at the time DiSimone filed his federal habeas petition.

This procedural posture appears awkward because if the district court believed that the insufficiency claim had been exhausted at the time DiSimone filed his habeas petition, as it ultimately concluded, then its stay would seem to have been unnecessary. That is, if petitioner's insufficiency claim had already been raised and rejected, it was not necessary to allow the state courts to review the issue, since petitioner had already given the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

### 1. The district court properly sought the guidance of state courts on a potentially novel issue of state law

It was appropriate for the district court, in the circumstances of this case, to stay the habeas petition for thirty days. This is so because, even assuming that DiSimone had properly raised his insufficiency claim on direct appeal, the lower courts had had no previous opportunity to consider, in DiSimone's case, the significance of *Payne*, which was decided *after* DiSimone's conviction became final. We have long recognized "the state court's superior ability to determine unsettled questions of state law," *Temple of the Lost Sheep, Inc. v.*

---

**8.** As noted *supra,* DiSimone does not appeal the district court's rejection of his remaining claims.

*Abrams,* 930 F.2d 178, 182 (2d. Cir.1991), and thus it was appropriate for the district court to seek the guidance of state courts on this issue.

And that, in effect, is what the district court did. In its memorandum and order staying the proceedings, the district court explained the purpose of its stay:

> While prediction is risky, this Court believes that the New York Court of Appeals, following *Payne* might apply its evidentiary ruling which now separates Depraved Indifference Murder from Intentional Murder, retroactively to those situated as Petitioner is. Alternatively, it might recognize the rule of *Payne* as possessing Constitutional underpinnings and therefore retroactive. \* \* \* Our federalism requires \* \* \* that the Courts of New York have a full and effective opportunity to address *these points,* fully and fairly presented.

A. 49 (emphasis added)

Thus, the district court invited the state courts to resolve a plausibly novel state law issue. And since New York rules of procedure allow a petitioner to challenge the sufficiency of trial evidence outside of direct appellate review where there has been a "change in the law," there was indeed a possibility that the state courts would reconsider their previous holdings with respect to the merits of DiSimone's conviction. *See* N.Y. CRIM. PROC. LAW § 440.10(2)(a) (Consol.2006). Under the circumstances, it was appropriate for the district court to stay the habeas petition for thirty days, and encourage the state courts to address the issue of the effect of *Payne* on this case.

*2. No special deference should be accorded to the state court's ruling on issue preservation*

As a result of the district court's stay, the state courts were invited to speak on the effects of *Payne* on the present case. As was their right, they declined, ruling that the issue had not been preserved for state court purposes and could not now be raised. But the question of whether a federal constitutional question was sufficiently asserted in state courts to form the basis of a federal habeas petition is ultimately a question of federal law which the federal courts must resolve for themselves.[9] Accordingly, and since "[w]e review a district court's ruling on a petition for a writ of habeas corpus *de novo,*" *English v. Artuz,* 164 F.3d 105, 108 (2d Cir. 1998), we must conduct an independent review of whether petitioner, by challenging New York Penal Law § 125.25(2) as unconstitutionally vague, exhausted his insufficiency claim.

*B. Daye analysis*

■ In state court, petitioner challenged New York Penal Law § 125.25(2) as unconstitutionally vague; he did not argue that the trial evidence was insufficient to support his conviction under the statute. The issue, then, is whether raising a void-for-vagueness challenge in the state courts suffices to preserve an insufficiency claim for purposes of habeas review. We conclude that—without more—it does not.

---

**9.** The district court reviewed the state court's decision under the standard in 28 U.S.C. § 2254(d)(2), referring to the decision as "a classic case of a decision that was based on an unreasonable determination of the facts in light of the record." This is the incorrect standard, given that the state court did not reach the merits, but instead, disposed of the case on procedural grounds. We have said that, "[b]y its terms, § 2254(d) requires such deference only with respect to a state-court 'adjudication on the *merits,*' not a disposition 'on a procedural, or other ground.'" *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (emphasis added)).

To be eligible for habeas relief, "the 'substance' of [petitioner's] * * * claim * * * must have been 'fairly presented' to the appropriate state appellate court." *Jackson*, 404 F.3d at 618 (citing *Picard*, 404 U.S. at 275, 278, 92 S.Ct. 509). As this court held in *Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186 (2d Cir.1982) (en banc), "a petitioner who does not cite 'chapter and verse of the Constitution' may nonetheless 'fairly present to the state courts the constitutional nature of his claim' " by demonstrating any one of four factors: "(a) reliance on pertinent federal cases employing constitutional analysis; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; or (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Jackson*, 404 F.3d at 618 (quoting *Daye*, 696 F.2d at 194).

The petitioner has failed to demonstrate any of the four *Daye* factors. *First*, petitioner acknowledges that *Jackson v. Virginia* and *In re Winship* are the standard federal cases cited in insufficiency challenges. Yet the petitioner cited neither of these cases in his briefing to the state courts. *Second*, while petitioner cited the New York Court of Appeals' decision in *People v. Sanchez*, 98 N.Y.2d 373, 777 N.E.2d 204, 748 N.Y.S.2d 312 (N.Y.2002)—which rejected, 4–3, a similar insufficiency challenge to a conviction for depraved indifference murder—he did so not for its possible relevance to any claim of constitutional insufficiency of evidence. Instead, petitioner cited *Sanchez*, and the three dissents in that case, to bolster, by showing confusion in the law, his contentions that the relevant law was impermissibly vague. Significantly, DiSimone did not argue, as he might have, that the *Sanchez* dissents were correct, that the *Sanchez* majority was wrong, or that the facts of

his case could be distinguished from the facts of *Sanchez*. *Third*, petitioner did not, in his state court briefing, speak in ways that could adequately call to mind "insufficiency." Rather, he pointed only to a different constitutional right than the one he now seeks to vindicate. And *fourth*, while the petitioner clearly relied on facts relating to his void-for-vagueness challenge in his state court briefing, reciting this pattern of facts—which sought unmistakably to address his *facial* challenge to the vagueness of the statute—the briefing did not describe a sufficiently common manner of presenting an *as applied* challenge of evidentiary insufficiency so as to make the state courts aware of such a challenge.

At bottom, raising a void-for-vagueness challenge in the state courts does not, without more, preserve an insufficiency challenge because raising the former does not "present the state courts with 'essentially the same legal doctrine' asserted in the habeas petition." *Jones v. Keane*, 329 F.3d 290, 296 (2d Cir.2003) (quoting *Daye*, 696 F.2d at 191–92) (holding that "reliance on a statute's ambiguity in support of an insufficiency of the evidence claim on appeal did not suffice to exhaust a constitutional vagueness claim raised in a habeas petition" (citing *Strogov v. Att'y Gen. of N.Y.*, 191 F.3d 188, 192 (2d Cir.1999)). Accordingly, petitioner's insufficiency claim was not preserved for federal habeas purposes, unless his failure to raise the issue was excused.

*C. Cause and prejudice or actual innocence*

"Where a [petitioner] has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the [petitioner] can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.' "

*Bousley v. United States,* 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (citations omitted); *see also Jones,* 329 F.3d at 296 (quoting *Bousley* ). DiSimone does not argue to us that he is "actually innocent," but instead seeks to demonstrate "cause" and "actual prejudice."

To demonstrate "cause" and "actual prejudice" DiSimone argues, first, that it would have been futile to make an insufficiency argument on direct appeal, and second, in the alternative, that the failure of his appellate counsel to raise insufficiency amounted to constitutionally ineffective assistance of counsel. Both of these arguments are without merit.

■■ We have held that it is futile to require exhaustion where prior state case law has consistently rejected a particular constitutional claim. *See Hawkins v. West,* 706 F.2d 437, 440–41 (2d Cir.1983). DiSimone's futility argument is without merit, however, because the New York state courts had not *consistently* rejected the insufficiency claim, and of particular importance, the *Sanchez* decision itself produced three separate dissents and was arguably decided on its facts (and was, therefore, potentially distinguishable). As the Supreme Court has said, "futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" *Bousley,* 523 U.S. at 623, 118 S.Ct. 1604 (quoting *Engle v. Isaac,* 456 U.S. 107, 130 n. 35,

102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)) (internal quotation marks omitted); *accord Jones,* 329 F.3d at 295; *Rosario v. United States,* 164 F.3d 729, 733 (2d Cir.1998).

■ We also reject DiSimone's argument that it was ineffective assistance of appellate counsel not to raise the insufficiency challenge in state court. The Supreme Court has held that ineffective assistance of appellate counsel claims cannot constitute "cause" for procedural default unless first presented in state court as an independent constitutional claim. *See Edwards v. Carpenter,* 529 U.S. 446, 451–52, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); *Sweet v. Bennett,* 353 F.3d 135, 141 n. 7 (2d Cir.2003). In New York, this can be done by petitioning for a writ of coram nobis, *see Sweet,* 353 F.3d at 141 n. 7; *People v. Bachert,* 69 N.Y.2d 593, 598–99, 509 N.E.2d 318, 321–22, 516 N.Y.S.2d 623, 626–27 (N.Y.1987), which DiSimone has not done.[10]

## II. *Brady claim*

Since DiSimone's argument is that the state prejudicially violated its *Brady* obligations, we must find, before habeas relief can be granted, that the state courts' ruling rejecting his *Brady* claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[11]

---

**10.** Because we find that DiSimone's insufficiency claim was procedurally defaulted, we need not, and do not, consider its merits: whether the evidence presented to the jury was sufficient, given New York law at the time he was convicted, to support a constitutionally valid guilty verdict for depraved indifference murder.

**11.** Section 2254(d) provides:
 (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall

not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
 (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
 resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The prosecution's *Brady* obligation is well-known: "[t]o the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation [grounded in the 14th Amendment] to disclose that evidence to the defendant." *Leka v. Portuondo,* 257 F.3d 89, 98 (2d Cir.2001) (quoting *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998)).

██ DiSimone argues that the state violated its *Brady* obligation by failing to disclose, until near the close of the government's case, information that a person other than DiSimone had asserted that he had stabbed the victim twice just before DiSimone allegedly stabbed the victim. DiSimone's claim requires us to address two questions. First, we must determine whether the government in fact violated its *Brady* disclosure obligation. In this respect we must examine what the Supreme Court has called the "three components of a true *Brady* violation:" that is: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Boyette v. Lefevre,* 246 F.3d 76, 89 (2d Cir.2001). If we conclude that the government violated its *Brady* obligation, we must then ask whether the state courts' rejection of petitioner's *Brady* claim involved an unreasonable application of clearly established federal law.

## A. Brady *Background*

On February 10, 1994, six days after Balancio's murder, Detective Robert Molinaro of the Yonkers Police Department interviewed a 21–year–old Yonkers resident named Luvic Gjonaj who had voluntarily agreed to cooperate in the investigation of the crime. Gjonaj provided a signed statement in which he represented that, on February 6, 1994, his cousin, Larry Djonovic, had called and asked him to come over because Djonovic's son, Nickoun Djonovic, "was acting crazy." When Gjonaj arrived, Larry and Nickoun Djonovic were downstairs in Nickoun's room, and as Gjonaj approached them, he "immediately saw that Nick was acting funny because he was standing by the window with his coat on and he had a little bit of blood under his nose." Gjonaj described the conversation that ensued:

> Larry then asked me to ask Nick about the lawyer he had heard him talking about, to his girlfriend on the phone. Nick said he was talking to his girlfriend about a lawyer because he was going to get a divorce from her. Larry then told me that his story was not true and that [Nick] had killed someone. Larry said he suspected this because of the bloody jacket that he had found in Nick[']s room, which he showed me, and because that he didn't come home until 7:00am on the morning after Thursday night, and because he had been hanging with a bad bunch of guys.

A. 274–75.

According to Gjonaj, Nickoun thereupon confessed to his involvement in Balancio's murder:

> * * * Nick explained that he was at the Strike Zone bar on Thursday night and while he was there a fight started outside the bar, in front, which he got involved in. And during that fight he had stabbed two different guys, one guy he stabbed once and did not know his name and the other guy that he stabbed twice, once in the chest, he knew, and his name was Lou Balancio * * *

Having implicated himself in Balancio's murder, Nickoun Djonovic then told Gjonaj "that after he had stabbed Lou, Antho-

ny DiSimone stood over him, in the middle of the street, and stabbed him several times with a 'Ranbo' [sic] type knife."

After obtaining Gjonaj's signed statement, Detective Molino applied for a search warrant of Nickoun Djonovic's residence. In an affidavit in support of the warrant application, Molino referred to the information Gjonaj had provided him. The search warrant was granted, and the police found and seized a bloody jacket, corroborating Gjonaj's statement. Police investigators sought Nickoun Djonovic for questioning, but were unable to locate him.

DiSimone made three separate requests for *Brady* material. First, in pre-trial motions in 26 January 2000, more than eight months before the start of trial, DiSimone made a general request 27 for *Brady* material and emphasized the importance of the material being "turned over to the defendant in time for it to be used effectively." The state did not disclose the Gjonaj statement. Then, one week before the start of trial, in a letter dated September 25, 2000, DiSimone made a second, more specific request for, *inter alia:* "any information obtained from witnesses, whether or not they are to be called at trial and whether or not the information is based on firsthand knowledge, indicating or tending to indicate that someone other than defendant DiSimone stabbed Louis Balancio or was accessorially liable for the stabbing of Balancio."

In response to this more specific request, the state did not turn over the Gjonaj statement but said that "[a]ny material arguably within the parameters of * * * your request[ ] will be submitted to [the trial judge] on October 2, 2000, prior to trial, for an *in camera* inspection." The prosecution turned over some documents to the court on October 2—the date the trial was set to begin—but those documents did not include the Gjonaj statement.

On October 2, 2000, just before jury selection, the defense noted that "there were references in the reports turned over by the People that a Nick Djonovic had a jacket which was either found at the crime scene, or was seized by virtue of a search warrant applied for by the People, in connection with the investigation of this case and, in fact, Mr. Djonovic * * * was listed on some of the reports of the FBI, as a suspect in the case." The defense then requested *Brady* material for the third time: "So, to get even more specific with respect to our request, if the People are in possession of any evidence, reports, Grand Jury testimony, or notes, which would indicate that Nick Djonovic had something to do with the stabbing in this case, and is exculpatory to the Defendant, I would ask that they turn that over to us."

Instead of disclosing the Gjonaj statement, the state moved in limine "to preclude the defense from making any reference in their opening statement and during the course of trial, with respect to Nick Djonovic, it is the People's position there is no, no link in the chain of evidence, that connects Nick Djonovic [to] the commission of this homicide." At the time of the state's motion, it had not disclosed the existence of the Gjonaj statement either to the defense or to the trial judge.

In response to the state's motion, the defense argued that the jacket appeared to have been seized as a result of a search warrant, and asked that the state produce for the judge "the search warrant if there is one, the affidavit which made Mr. Djonovic a suspect and all of the notes and investigatory reports, which up to that time made Mr. Djonovic a suspect." The prosecution referred to the defense's efforts as "a fishing expedition," and noted that the defense had "reached out to a witness who gave a certain report allegedly implicating Nick and they want to see

what kind of reports we have subsequent to that initial witness' statements and they know about Nick.... [I]t's not *Brady* if they know about it, that's clear under the case law." The court ordered in camera review of any search warrants or supporting documentation.

The state did not submit the search warrant affidavit to the court until October 6, the day opening statements were scheduled to begin. The trial court did not turn the statement over to the defense until eleven days later, on October 17, 2000, shortly before the close of the state's case. At that time, the court said, "[W]hile I readily agree that there's a very close question here, I do not think it is *Brady* material because the statement is as much inculpatory as it is exculpatory. However, despite technicalities, the statement does deal with the factual aspect of this case, and therefore whether it is or is not *Brady* material, I'm going to turn it over to [defense counsel]."

Defense counsel immediately requested a continuance, stating for the record that he had never known of Gjonaj and had not had a chance to interview him, and that there was a knife mentioned in the affidavit. Defense counsel also asked for time to speak to Gjonaj and to investigate what happened to the knife, as well as to speak to the people to whom Gjonaj said he had spoken. In response, counsel for the state said that "the information contained in that affidavit was thoroughly investigated by my office and negated on several counts and several fronts. Perhaps [co-counsel] and I will consult with the defense counsel and tell them why that statement is basically a lie. Perhaps we can save some time." The court responded by saying to defense counsel, "I'm sure you will take care of" investigating the matters in the affidavit. Defense counsel then again said he needed time, and the court said, "I

understand" but did not grant the continuance.

The next day, DiSimone moved for a mistrial on the ground that the Gjonaj statement was not supplied to the defense in a timely fashion. Defense counsel said the report "would have radically altered the way the defense strategy was framed, the way witnesses were examined, [and] the way the defense opened." The state countered that the statement was not *Brady* material and, in any event, "there may be situations in which a prosecutor, in his discretion, may fairly keep to himself knowledge of available testimony which he views as mistaken or false." The court asked defense counsel where he had heard Djonovic's name, and counsel said that he knew Djonovic's clothes had been sent to the FBI for testing and that the FBI and state authorities were searching for him, but that the defense "had no factual details about who this person was until we got that report yesterday." The court rejected the mistrial motion. The defense moved again for a mistrial the next day, at the close of the state's case, and again the court denied the motion.

*B. Brady analysis*

On appeal, the government argues (1) that Gjonaj's affidavit was not *Brady* material because it was inculpatory as well as exculpatory; (2) that, assuming arguendo that *Brady* data was suppressed, it was not "material" given the "overwhelming" evidence of DiSimone's guilt; (3) that the information about Nick Djonovic's statements was, in any event, disclosed to defense counsel with enough time for defense counsel to make use of it; and (4) that the information was not "suppressed" because defense counsel already knew the essential facts permitting him to take advantage of the evidence. We reject the government's first, second and third contentions; re remand for further consideration the state's fourth argument.

*1. The information was "favorable," and therefore was* Brady *material.*

To constitute *Brady* material, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir.2004) (quoting *Strickler,* 527 U.S. at 281–82, 119 S.Ct. 1936). The information in Gjonaj's affidavit was clearly *Brady* material. In a case in which not a single witness actually saw DiSimone stab the victim, evidence that another person had confessed to the stabbing was unmistakably exculpatory; it was "of a kind that would suggest to any prosecutor that the defense would want to know about it." *Leka,* 257 F.3d at 99. In particular, the evidence supported a potential defense theory that, whatever DiSimone's involvement in the fight, he was not the *cause* of Balancio's death. *See People v. Dlugash,* 41 N.Y.2d 725, 731, 363 N.E.2d 1155, 1158, 395 N.Y.S.2d 419, 423 (N.Y.1977) ("To sustain a homicide conviction, it must be established, beyond a reasonable doubt, that the defendant caused the death of another person."); *id.* ("Whatever else it may be, it is not murder to shoot a dead body. Man dies but once." (citation omitted)).

The government's contentions to the contrary are wholly without merit. In the first place, if there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it. *Mendez v. Artuz,* No. 98 Civ. 2652(LMM)(A), 2000 WL 722613, at * 14 (S.D.N.Y. June 6, 2000), *report and*

recommendation adopted by *Mendez v. Artuz,* 2000 WL 1154320 (S.D.N.Y. Aug.14, 2000), *aff'd by Mendez v. Artuz,* 303 F.3d 411 (2d Cir.2002) ("If the evidence is favorable to the accused, * * * then it must be disclosed, even if the prosecution believes the evidence is not thoroughly reliable."). To allow otherwise would be to appoint the fox as henhouse guard.

Moreover, to the extent that the information was also inculpatory, because it supported the government's allegation that DiSimone did in fact stab Balancio, this Court has already made it unmistakably clear that evidence "having both an inculpatory and exculpatory effect" must be turned over to the defense counsel as *Brady* material. *Rivas,* 377 F.3d at 199 (holding that the government violated its *Brady* obligations by failing timely to disclose a statement that was consistent with both (a) the government's theory that a package of drugs belonged to the defendant, and (b) the defense's theory that the package belonged to someone else).

Furthermore, and quite apart from the fact that Djonovic's statement went directly to the questions of whether DiSimone's asserted stabbings *caused* the victim's death, the statement was *Brady* material for another reason. A confession is not an indivisible whole that must either rise or sink as a unit; it is conceivable that, if the government had timely disclosed Gjonaj's statement, the defendant might have discovered evidence that Nickoun Djonovic—who appeared to have been consulting with a lawyer—accurately reported his involvement in Balancio's murder, but had lied, altogether, with regard to DiSimone's involvement.[12] And, at the least, *Brady* de-

---

**12.** While it was against Nickoun Djonovic's penological interests to confess to having stabbed Balancio, it was to his benefit to claim DiSimone subsequently stabbed Balancio as well—which, under New York law, might well have the effect of making DiSimone an intervening cause of Balancio's death. *People v. Bonilla,* 95 A.D.2d 396, 432, 467 N.Y.S.2d 599, 621 (App.Div.2d Dep't 1983) (Titone, J.P., dissenting in part and

mands that the prosecution disclose the evidence so as to enable the defendant to investigate such a possibility. *Cf. Dlugash*, 41 N.Y.2d at 736, 395 N.Y.S.2d at 427, 363 N.E.2d at 1162 ("[T]he credibility of witnesses is a question of fact and the jury may choose to believe some, but not all, of a witness' testimony.").

### 2. The information was material

The Supreme Court's test for a *Brady* violation requires us to ask "whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry." *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir.2003) (finding that defendant failed to demonstrate materiality) (citing *Strickler*, 527 U.S. at 282, 119 S.Ct. 1936). The "touchstone of materiality is a 'a reasonable probability' of a different result." *Id.* A " 'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome.' " *United States v. Madori*, 419 F.3d 159, 169 (2d Cir.2005) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Under *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555.

 In the circumstances of this case, it is clear that the *Brady* evidence was material. The state's principal witness, Darin Mazzarella, had entered into a cooperation agreement with the FBI in consideration of leniency in an unrelated case,

and his statements to the FBI came several years after Balancio's murder took place. No witness testified to seeing the stabbing and no murder weapon was recovered. While DiSimone's clothing was found to have had Balancio's blood on it, this evidence did not conclusively establish that DiSimone in fact *stabbed* Balancio. Furthermore, and most tellingly, Nickoun Djonovic's "confession" could have been used to persuade the jury that, whatever DiSimone's role was in the fight outside of the Strike Zone, he was not *responsible for causing* Balancio's death. The FBI DNA scientists testified only that the blood on DiSimone's sweater was "consistent with" his having stabbed Balancio. Moreover, the medical examiner could not tell the order of the stab wounds, but said that, if the stab to the heart were the first one, "without treatment it would certainly have caused death." This is not, therefore, a case in which "a conviction is supported by overwhelming evidence," *Leka*, 257 F.3d at 104 ("[W]hen a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted."). We hold that there is a "reasonable probability" that had this material been available the result in the case would have been different. *See Madori*, 419 F.3d at 169.

### 3. The effect of the government's late disclosure

We conclude that if the defendant or his attorney did not already know of, or have constructive knowledge of, the information in Gjonaj's statement, then that information was not disclosed "in sufficient time to afford the defense an opportunity for use." *Leka*, 257 F.3d at 103. In *Leka*, we ac-

---

concurring in part) ("So, if the defendant has inflicted a wound which would prove fatal and a third party comes along while the victim has but hours to live and kills him instantly, the third-party's act substantially hastening death constitutes the cause of death and the

defendant cannot be convicted of homicide."). Under the circumstances, it is arguable that the exculpatory portions of Nickoun Djonovic's statement were more credible than the inculpatory part.

knowledged that "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made." *Id.* at 100. Still, in *Leka* we warned that "new witnesses or developments tend to throw existing strategies and preparation into disarray." *Id.* at 101; *see also id.* at 100 ("[O]nce trial comes, the prosecution may not assume that the defense is still in the investigatory mode."). We explained:

> Even if the defense was at last afforded a chance after the close of the prosecution case to make an application to try to contact [the witness whose statement had been theretofore been suppressed in *Leka* ], the options left open to the defense were to expend and perhaps waste scarce trial resources on a possible dry hole, or to call a witness cold, which would be suicidal. These are not opportunities for use.

*Id.* at 103.

The more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense an "opportunity for use." In the case before us, the information about Nickoun Djonovic's involvement was clearly valuable to DiSimone. On its face, it would likely have altered the defense's cross examination of the medical examiner and it could even have completely changed the nature of the defense strategy—focusing it more on whether DiSimone *caused* the victim's death, from whether he stabbed the victim at all. Moreover, knowledge of Djonovic's admission would have induced the defense to conduct further investigations in order to use the evidence fully. As such, we do not doubt that withholding the data until near the close of the prosecution's case constituted "suppression" (assuming the defense was not already aware of the information).

And, the fact that the defense, more than halfway through the trial, could have sought to mitigate its loss does not change this result, for as we made clear in *Leka*, "[t]he opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought. * * * And a responsible lawyer in the midst of the pressures and paranoias of trial may well deploy scarce trial resources doing other things." *Id.* at 103. All this, moreover, is especially so since the damage caused by the delay was aggravated by the failure of the court to grant the defense's requested continuance.

*4. Was there prior knowledge of the relevant information?*

 We believe it is clear that the delayed disclosure of Djonovic's admissions meets the three requirements of *Brady*. But there is also a fourth prerequisite for a successful *Brady* claim. "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Leka*, 257 F.3d at 100 (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982) (citations omitted)); *see also Jackson*, 345 F.3d at 73 (quoting *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995)). The government argues that, long before the formal disclosure, the defendant was already well aware of Nickoun Djonovic's involvement in Balancio's murder. It cites the remarkable specificity of defense counsel's *Brady* requests as evidence of this awareness. *See, e.g.*, Appendix at 279 (requesting "any information obtained from witnesses, whether or not * * * the information is based on firsthand knowledge, indicating or tending to indicate that someone other than defendant DiSimone stabbed Louis Balancio * * * "); *id.* at 256–57 ("[I]f the People

are in possession of any evidence * * * which would indicate that Nick Djonovic had something to do with the stabbing in this case, and is exculpatory to the Defendant, I would ask that they turn that over to us."). This argument cannot be dismissed out of hand, but neither is it self-evidently valid. It depends on facts—and on inferences from facts. On the record before us, we are unable to determine its ultimate merit. In other words, we cannot assess at this time the extent to which the defendant or his counsel either knew or should have known about the exculpatory evidence.

This question has not to date been the focus of attention in the courts that have reviewed DiSimone's case. The Appellate· Division rejected petitioner's *Brady* claim on the grounds that "[a]t a minimum, the information was disclosed to the defendant in time to give him a meaningful opportunity to use it." This conclusion was unreasonable, and the state court, having made it, did not openly consider whether defendant or his attorney "knew, or should have known" of the *Brady* material. Likewise, the federal district court, in the course of granting unconditional habeas on insufficiency of evidence grounds, summarily rejected DiSimone's *Brady* claim, saying only that "[t]he Court rejects all other claims set forth in the original petition filed herein, as either not preserved or not exhausted, or lacking in merit."

Given our ruling on the other issues before us, the question of defendant's or his attorney's knowledge of the *Brady* material has now become crucial and we, therefore, remand the case to the district court for further fact-finding on that question.

In view of this remand, we also cannot at this time ultimately decide whether the state courts' failure to provide relief was contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. We do note, however, that as far as the three requirements of *Brady* that we have held have been met, it seems clear that this more stringent prerequisite to habeas has also been satisfied. The law as to *Brady* is well-known and has been settled by the Supreme Court. Whether the same is also the case as to the issue of petitioner's pre-existing knowledge is, instead, too early to say.

### III. Confrontation Clause

Because we cannot tell at this juncture whether DiSimone will be granted a new trial, and given that relevant standards governing the Sixth Amendment's Confrontation Clause are currently in considerable flux, *compare Mungo v. Duncan,* 393 F.3d 327 (2d Cir.2004) (refusing to apply *Crawford* retroactively to state habeas petitioners) *with Whorton v. Bockting,* —— U.S. ——, 126 S.Ct. 2017, 164 L.Ed.2d 778 (2006) (granting petition for writ of certiorari to review a Ninth Circuit decision, *Bockting v. Bayer,* 399 F.3d 1010 (9th Cir.2005), which held that *Crawford* does apply retroactively on collateral review), we refrain from ruling on DiSimone's Confrontation Clause challenge at this time.

### CONCLUSION

For the foregoing reasons, the district court's grant of the writ of habeas corpus is REVERSED, and the case is REMANDED to the district court for further fact-finding as to petitioner's *Brady* claim.