SUMMARY ORDER
Petitioner-Appellant Jose Quintana (“Quintana”) appeals the denial of his request for a writ of habeas corpus by the United States District Court for the District of Connecticut (Nevas, J.). Quintana argues that the State of Connecticut violated his right to due process of law by withholding impeachment evidence at the criminal trial resulting in his conviction for felony murder under Conn. Gen.Stat. § 53a-54c. See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that “suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment”). On appeal, Quintana’s principal contention is that the state *24 committed a Brady violation by failing to disclose that Gregorio Hernandez (“Hernandez”), who testified that Quintana confessed to him, received a split-fee reward from the Crime Stoppers organization— $200 before and $800 after he testified at Quintana’s trial.[1] We assume the parties’ familiarity with the underlying facts, procedural history, and the issues on appeal.
Because Quintana’s request for a writ of habeas corpus involves review of a state court conviction, the Antiterrorism and Effective Death Penalty Act of 1996 provides the standard of review:
An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....
28 U.S.C. § 2254(d). “As we have interpreted this standard, we decide not whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court’s interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time.” Policano v. Herbert, 507 F.3d 111, 115 (2d Cir.2007) (emphasis added) (internal quotation marks omitted). “[I]t is well-established in [this] [C]ircuit that the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.” Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir.2006) (internal quotation marks omitted). With respect to the “unreasonable application” prong at issue here, “the range of reasonable judgment can depend in part on the nature of the relevant rule. ... The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.” Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). As indicated below, Quintana’s Brady claim turns on a general rule. Hence, we must afford the state courts “more leeway” in the “case-by-case determination ]” necessitated by his claim. Id.
“ ‘There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.’ ” Boyette v. Lefevre, 246 F.3d 76, 89 (2d Cir.2001) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Respondent does not challenge the Appellate Court of Connecticut’s determination that the first two elements are met. Resp. Br. 16-17. At issue is the state court’s deter *25 mination that Quintana failed to demonstrate prejudice by failing to establish the materiality element of a Brady claim. See Boyette, 246 F.3d at 91 (“The suppression of exculpatory documents does not cause a constitutional violation unless the documents are material.”).
We have recently explained the materiality inquiry as follows:
The touchstone of materiality is a[ ] reasonable probability of a different result. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Under Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), “[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Id. at 434, 115 S.Ct. 1555.
DiSimone v. Phillips, 461 F.3d 181, 196 (2d Cir.2006) (internal quotation marks and citations omitted).[2] In other words, the issue is “whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (internal quotation marks omitted). “We look at the cumulative effect of suppression in light of the evidence as a whole.” United States v. Jackson, 345 F.3d 59, 74 (2d Cir.2003) (internal quotation marks omitted).
Of particular importance in the case at bar, we have indicated that a “new trial is generally not required when the testimony of the witness is corroborated by other testimony or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.” Id. (internal quotation marks omitted). Both circumstances exist here.
First, Hernandez’s testimony was corroborated by other evidence in the record. His testimony was substantially consistent with the testimony of Jeannette Berman (“Berman”), Quintana’s former girlfriend. Both testified that Quintana said that he stabbed the victim twice; that the stabbing occurred after the victim left the store; and that Blas Oliveras (“Oliveras”) was present during the incident. See Jan. 28, 1987 Tr. 130-31; Jan. 29, 1987 Tr. 10-11; see also Quintana v. Comm’r of Corr., 55 Conn.App. 426, 739 A.2d 701, 709-10 (1999). Further, the circumstances of Quintana’s confession to Hernandez were corroborated by Berman’s testimony. Quintana, 739 A.2d at 704-05.
The only significant inconsistency between Hernandez’s testimony and Berman’s testimony concerns the circumstances prompting the stabbing. Hernandez testified that Quintana told him that he stabbed the victim during the course of an attempted robbery because the victim did not give him any money. Id. at 710; Jan 28, 1987 Tr. 131. Meanwhile, Berman testified that Quintana told her that the victim, instigated a fight with Quintana and Oliveras, cut Quintana’s hand with a knife or some other object, and that Quintana stabbed the victim in self-defense. Quintana, 739 A.2d at 710; Jan. 29, 1987 Tr. 32-33, *26 38. Hernandez’s account, but not Berman’s, is corroborated by other evidence. The victim had only two dollars on him, which his girlfriend had given him to purchase a pack of cigarettes. Jan. 28, 1987 Tr. 16-17. More importantly, no knife or other sharp object, which the victim might have used to cut Quintana, was found on or near the victim. Quintana, 739 A.2d at 710. Further, seven days after the stabbing, the officer who photographed Quintana holding a plaque containing booking information, and who had handed Quintana the plaque, did not notice any injuries on Quintana’s hands. January 29, 1987 Tr. 114-15. Although Quintana testified at his habeas corpus trial that the victim had cut him on the shoulder, leaving an inch to an inch and a half gash that did not heal for four months, and which kept opening up while he was in prison over a week later, Feb. 10, 1997 Hab. Tr. 163, 165-66, Quintana’s inmate medical screening form, filled out a week after he was allegedly cut, states that he had no “skin ... abnormalities considered to warrant immediate medical opinion,” or “bleeding ... suggesting need for Emergency Service.” J.A. 187. Further, Quintana’s testimony that he was gashed on his shoulder was inconsistent with Berman’s account that he had told her that he was cut on his hand.[3]
Moreover, Hernandez’s account is bolstered by Quintana’s statements that are strongly suggestive of his consciousness of guilt. See United States v. Cassese, 428 F.3d 92, 101 (2d Cir.2005) (stating that “eviclence of after-the-fact consciousness of guilt may have independent probative force, and may strengthen inferences supplied by other pieces of evidence.... ”). Quintana told Berman, inter alia, (1) he was afraid that Oliveras “might, like, get scared and tell about the incident,” Jan. 29, 1987 Tr. 18-19; (2) “he was staying at different people’s houses everyday,” id. 17; and (3) he “knew [the police] would ... get him some day,” and “if they did get him, they would have to take him dead,” id. 21.
Second, Hernandez’s credibility was effectively impeached during Quintana’s trial. Hernandez testified that he voluntarily went to the police station and provided a statement indicating that Quintana had confessed to him. See Jan. 28, 1987 Tr. 142-43. Hernandez further testified that, when he was at the police station, the police did not say they would do anything to him if he refused to provide a statement, and moreover, that he was not threatened in any way. Id. 141, 143-44. Quintana’s counsel then confronted Hernandez with conflicting testimony he had provided at Quintana’s probable cause hearing. Quintana’s counsel asked: “I asked you a question, ‘So, they said to you, if you don’t give a statement, then you must be involved in the murder, is that correct?’ ” Id. 145. Hernandez testified that he remembered the question and further testified that he remembered his answer to be as follows: “You might say I am a witness, but I am not, you know. I am not involved.” Id. Quintana’s counsel then provided the answer that Hernandez had actually given at the probable cause hearing: “Your answer was, “Yes, sir.’” Id. When faced with his prior testimony, Hernandez directly contradicted himself. *27 He was first asked whether “you gave [the] statement [incriminating Quintana] so they wouldn’t accuse you of murder,” and answered “No, sir.” Id. 146. Then he was asked: “On the probable cause hearing, the question was asked of you, ‘So, is that why you gave this statement so you wouldn’t be accused of murder?’ Your answer at that time was, ‘Yes, sir.’ ... [W]ould that be your answer today?” Id. Hernandez replied, “Yes sir.” Id.
This colloquy substantially undercuts Hernandez’s credibility and tends to render cumulative and therefore immaterial the undisclosed impeachment evidence of the split-payment. See Shabazz v. Artuz, 336 F.3d 154, 166 (2d Cir.2003) (“[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed 2 evidence may be cumulative, and hence not material.”) (internal quotation marks omitted).
To summarize, as the state court found, Hernandez’s testimony was corroborated by independent evidence and the withheld impeachment evidence would have been cumulative. Thus, given that our review is deferential and limited to whether the state court’s determination was “unreasonable” rather than simply incorrect, Policano, 507 F.3d at 115 (“[W]e decide not whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court’s interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time.”) (emphasis added) (internal quotation marks omitted), and the materiality inquiry turns on a general standard warranting some leeway in its application, see Yarborough, 541 U.S. at 664, 124 S.Ct. 2140, we cannot say that the Appellate Court of Connecticut’s ruling, that Quintana failed to establish the materiality component of a Brady violation, was an unreasonable application of federal law.
All arguments not discussed in this summary order are found to be without merit. For the above reasons, the district court’s denial of Quintana’s request for a writ of habeas corpus is
AFFIRMED.

. In a footnote in his brief, Quintana points out that the habeas trial court also addressed his contention that the state withheld the existence of pending criminal charges against Hernandez. Pet’r's Br. 7, n. 1. The court found that withholding such charges, even in conjunction with the failure to disclose the Crime Stoppers payment, was immaterial. See Quintana v. Comm'r of Corr., 1998 WL 99279, at *18 n. 11 (Conn.Super.Ct.1998). However, Quintana presents no argument on this front in his brief, and the issue is therefore waived. See Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 446 n. 3 (2d Cir.2006) ("[W]e have repeatedly ruled that arguments presented to us only in a footnote are not entitled to appellate consideration.” (internal quotation marks omitted)). In any event, in light of the following analysis, such impeachment evidence is cumulative, and would not change the result reached here.

. We note that Quintana's argument that “the standard as enunciated by the lower court is incorrect and placed a greater burden” on him lacks merit. Pet’r’s Br. 12. The district court set forth the same standard we set forth in DiSimone : "Quintana must demonstrate a reasonable probability that the result of the trial would have been different if the suppressed evidence had been provided....” J.A. 17.

. Although, at the habeas corpus trial, Quintana's former lawyer testified that he had a recollection that he was told about a cut on Quintana’s hand from either Quintana or Berman, he clearly testified that he saw no evidence of such a cut. See Feb. 4, 1997 Hab. Tr. 62-63, 105-06, 118.